Jones, Chief Judge,
delivered the opinion of the court:
• This is a suit for rental value of equipment furnished, de-murrage paid, and other charges in connection with a cost-plus-fixed-fee construction contract.
Plaintiff, by contract dated August 21,1940, agreed to provide plant, equipment, labor, materials, and services necessary for certain construction work in the Boston Navy Yard for an estimated net cost of $630,000, plus a fee of $35,000. A change order issued May 6, 1941, expanding the work to the South Boston Navy Yard, increased the estimated net cost to $1,230,000 and the fixed fee to $62,000, or a total estimated cost of $1,292,000.
Notice to proceed was given August 28, 1940. The Chief of the Bureau of Yards and Docks of the Navy Department was the contracting officer, but in accordance with Article 1 of the contract he designated Commander Searles, Civil Engineer, United States Navy, as the officer in charge of the contract. On February 27,1941, Commander Henry E. Wilson, a Navy engineer, was substituted for Commander Searles.
When work began Commander Searles appointed Lieutenant Robert B. McDonnell as resident officer in charge of the contract, and told plaintiff’s president that McDonnell was to have complete charge of the work, instructing him to take up all matters arising under the contract with McDonnell and not to come to him (Searles) on such matters. Searles told McDonnell that in the event of any doubt in his mind in the administration of the contract he should consult with him (Searles). Thereafter in accordance with these instructions, plaintiff’s representatives never sought any decisions from Searles or from Wilson, who succeeded him.
In September 1940 plaintiff’s president, Titcomb, took up with McDonnell the question of preparing a plant and equipment schedule, as required by Article 7 of the contract, for the purpose of computing the rental compensation to be paid plaintiff for items of equipment owned or controlled by plaintiff. In the discussion Titcomb stated that he would prepare *321 a rental schedule. About the same time McDonnell consulted with Searles who instructed McDonnell to work out a rental schedule for use under the contract.
Soon after these discussions McDonnell prepared an equipment rental schedule which was based upon the rates applicable to the New England section, as published in the Engineering News-Kecord, and the rates set out in the manual of the Associated General Contractors of America, a recognized engineering periodical. Before submitting the schedule to plaintiff’s president McDonnell discussed the schedules with Searles and informed him of the sources he had used in their preparation. Searles approved the schedule and directed McDonnell to deliver it to plaintiff as the schedule to be used under the contract. It was delivered to plaintiff September 20, 1940. It listed monthly payments with a deduction for maintenance and repair. This deduction was made because the defendant was paying for such maintenance and repair separately from the rent.
Upon delivery of the schedule to plaintiff’s president with an explanation of the source, plaintiff’s president stated that the rates were too high in that they included profit. He suggested that the schedule be revised by deducting the profit item since Article 7 of the contract provided that rental should be based on contractor’s cost without any element of profit. McDonnell accordingly revised the schedule by deducting five percent therefrom for profit and submitted it again to Searles with an explanation of the change. Searles examined and approved it and asked McDonnell for a memorandum to the Chief of the Bureau of Yards and Docks explaining the revision. Searles directed McDonnell to deliver the revised schedule to plaintiff as the schedule to be used under the contract. This was done September 26,1940.
During the performance of the contract McDonnell became concerned about payments that were being made, including the rental payments. He discussed the matter with Searles, who informed him that he had talked with the Chief of the Bureau of Yards and Docks about the payments and that he had clearance from that official.
When change order B enlarging the work was issued on May 6, 1941, a similar schedule was prepared for the addi *322 tional work. Plaintiff’s president discussed tbe schedule with Commander Wilson, who had succeeded Searles. Wilson raised a question as to the rental rates for two articles of equipment. Plaintiff agreed to lower the rental rates on these two items. Wilson approved the schedule as changed.
These two schedules were used continuously during the performance of the work under the contract for the purpose of making up the monthly bills for the use of plaintiff’s equipment. No other rental schedule was suggested by the officer in charge or anyone else while the work was being performed. Month to month payments were made in accordance with the schedules by vouchers prepared by the officer in charge, submitted to plaintiff and signed by the officer in charge, and also by the contracting officer, each making a certificate to the effect that it was for material and services rendered and that the prices were just and reasonable. Plaintiff received monthly checks following this procedure.
The rentals totaled $34,229.44. Plaintiff received that entire amount, including the retained percentage of 15 percent provided in Article 7 of the contract, except an amount of $1,443.68 of such retained percentage. These retained percentages of previous monthly bills were included in later vouchers. The plaintiff under pressure of business had not submitted a bill for the retained percentage of the last vouchers until the controversy arose.
The field work was completed August 20, 1941. On November 27, 1941, plaintiff received a letter dated November 26,1941, transmitting a circular letter dated August 30,1941. The letter stated that in order to make adjustments before reserve on rentals of plaintiff’s equipment “may be paid, it will be necessary for you [plaintiff] to complete enclosures”. The first four paragraphs of the circular are set out in finding 12. Its stated purpose was to standardize the procedure to be followed at each station in determining monthly equipment rental rates, in adjusting charges and in controlling cost of overhaul. The plan contemplated an initial schedule, a final schedule, and in some instances an interim schedule, and called attention to the fact that rentals constitute an important element of cost. It ref erred to two situations, (1) rental payments under new contracts and (2) adjustments *323 and final settlement of equipment rental under contracts started in the past.
The circular letter further stated that for all equipment under newly released contracts and for all additional equipment required under existing contracts forms FC 509 and 508 should be used.
This letter was the first information plaintiff had ever had that the procedure set out therein was required. At that time all plaintiff’s equipment had been withdrawn from the job, its field office closed and the employees of such office dispersed. Acquisition and fabrication costs for all of the equipment could not be ascertained from plaintiff’s records, no appraisals had been made at the time and it was difficult, in some respects impossible, to comply with all the provisions of the circular letter. Plaintiff’s president called these difficulties to the attention of the resident officer in charge and urged that the circular letter was inapplicable to plaintiff’s contract since the contract was completed before its issuance. That officer understood the situation and suggested that they talk it over with the officer in charge. In the meantime no answer to the request had been prepared by plaintiff.
On August 27, 1942, the officer in charge of construction at the Boston Navy Yard wrote plaintiff that the field work on his contract was completed August 20, 1941, but that to date his office had not been furnished records for financial and technical closure of the contract in accordance with instructions of the Bureau of Yards and Docks. Transmitted also was a circular letter asking for the filling out of form 508 reflecting all final settlement of disputed items and cost of overhaul on contractor’s owned or controlled equipment.
Plaintiff on September 23, 1942, submitted drafts of the schedules on the form 509, but on being informed that that form was not to be used, prepared and submitted on October 2, 1942, a report on form 508, at the same time orally protesting to that office that it was not required to prepare and submit it, since its rental schedules had been prepared and approved when the work started. The schedule was not satisfactory to the officer in charge, nor was a later one submitted under written protest satisfactory to such officer.
*324 Thereafter the administrative assistant to the officer in charge of construction at the Boston Navy Yard, pursuant to a directive from the Bureau of Yards and Docks, prepared a rental schedule dated December 15,1943, which was unsatisfactory to plaintiff. However, the administrative assistant was instructed to use that schedule and mark it submitted under protest. It allowed a total of $24,367.40 in rentals, which was a reduction of $9,862.04 from the amount computed under the original schedules.
The Government’s estimates were based not on a month-by-month basis, but on the average annual use by plaintiff for the time it was on the job for those items for which plaintiff was able to furnish the cost. On the other items the defendant appraised them on the basis of (1) the fair value of the item and (2) the estimated remaining life of the item. Appraisal values of the actual equipment could not be made since it had long since been removed from the job.
The difference in the schedules was deducted and a release signed which specifically excepted from the release the dispute as to the rental payments, as well as certain other claims which will be discussed later.
The chief difference in plaintiff’s and defendant’s rental schedules was due to the month’s use factor employed by plaintiff and the elimination of this factor by the defendant in preparing its schedules. We think plaintiff is entitled to recover on this item. The rental schedules were approved by the proper officers and rentals paid month by month in accord with schedules based upon the custom in trade circles. To permit defendant to invoke post-contract schedules that were authorized after the completion of the work and were actually prepared several months after completion when the equipment had been sent elsewhere and plaintiff’s operating field employees disbanded, would be to give a retroactive effect to such regulations and would be manifestly unjust. Defendant’s schedules were based upon estimates without any view of the physical properties, and without any chance on plaintiff’s part to keep its records and appraisals in accord with regulations it didn’t know anything about, and which at the time of the contract and during the entire period of performance did not exist.
*325 The plaintiff also claims $350.90 demurrage paid by it to the railroad company on cars that carried materials into the Boston Naval Dry Docks and South Boston Naval Annex. It is true that this item of cost was actually paid by plaintiff. But when it put on extra men the cars were unloaded promptly. The evidence is not sufficient for us to find that this was a necessary item of cost and plaintiff cannot recover therefor.
The plaintiff also seeks to recover the sums which it claims to have expended in preparing schedules required by defendant. Plaintiff submitted bills for $650 paid to a firm of public accountants and $1,146.50 paid to its central office employees. The officer in charge of construction disallowed the amount claimed for the certified public accountants, allowed $402.29 for the central office employees, and disallowed the balance. The plaintiff appealed to the Secretary of the Navy. The Chief of the Bureau of Yards and Docks in advising of the decision stated that the employment of certified public accountants was unnecessary, and that the $402.29 for the work of the central office employees was a fair allowance.
We are unable to find that this decision was arbitrary or capricious, and plaintiff will be denied any additional recovery for this item.
Plaintiff is entitled to recover the sum of $9,862.04.
Howell, Judge; MabdeN, Judge; Wi-iitakek, Judge; and LixtletoN, Judge, concur.